*493
 
 Ru&fxn, C. J.
 

 If it were admitted, that the instruction prayed for, as to an estoppel on the defendant to deny the riage of his parents, was correct, and that it was erroneous to refuse it; the judgment rendered in favor of the person, gainst whom the error operates, could not be affected; for that would be no ground for reversing it, nor could it for that reason be affirmed, if, for some other error against the appellant, it ought to be reversed. It is to be regretted, therefore, that such points should be stated in the record, as they almost necessarily draw the Court into discussions not material to the' decision of the cause, in order to avoid an inference from our silence of an approbation of the position. Such is the case on this occasion,- as the counsel for the plaintiff has pressed this point in the argument here. We have therefore to say, that We think that part of the instruction was properly refused; not because it was immaterial, but because it was entirely erroneous. The death of one of the parties to this marriage makes no difference, as to the power of enquiring into its validity,for any and all purposes. There is a distinction in the law between void and voidable marriages, where, even, they were regularly solemnized. The latter, which are sometimes ■ called marriages
 
 de facto,
 
 are such as are contracted between persons, who have capacity to contract marriage, but are for-' bidden by law from contracting it with each other: as to which, therefore, there was a jurisdiction in the spiritual Courts to declare the nullity of the marriage. But until the nullity was thus declared, as an existing marriage, it was re-' cognised as valid'-both in the canon and- common laW; and,as there can be no proceeding in the ecclesiastical Court against the parties,- after their death or that of one of them,that event virtually makes the marriage good-
 
 ah initio
 
 to all-intents, and the wife and husband may have dower and cur-tesy and the issue will be legitimate. Co. Lit. 32, 33. But1 where the marriage is between persons, one of whom has no' capacity to contract marriage at all, as where there is a want' of age, or’understanding, or a prior marriage still subsisting!’ the marriage is void absolutely and from the beginning, and’
 
 *494
 
 may be enquired of in any Court. For, although, in such there may be a proceeding in the ecclesiastical Court, it is not to dissolve the marriage, but merely, for the convenience 0|. tjje partjeSj j;0 gn4 the fact and declare the marriage thereupon to have been void,
 
 ab initio
 
 ; and no civil rights can be acquired under such a marriage. It is said to be no marriage, but a profanation of marriage, and the
 
 factum
 
 is a nullity..— Thus, “if a man, seized of land, take a wife, and, during the marriage, he taketh another wife, and the husband die, leaving both wives, the latter shall not have dower; because the marriage between them is void’. And if a woman take a husband, and, living the same husband, she marrieth another, who is seized of land and the second husband dieth, she shall not have dower of his land:
 
 causa patet.
 
 Perk. 3, 304, 305. The same doctrine is laid down by Lord Holt in
 
 Hemming
 
 v.
 
 Price, 12
 
 Mod. 432, and is found in
 
 Riddesden
 
 v.
 
 Wogan,
 
 Cro. Eliz. 858, and in many other cases. Bigamy repels the right to administer on the estate of the husband or wife, and to a distributive share, and to the acquisition
 
 by the
 
 husband of the personal property
 
 oí
 
 the wife by the marriage. Upon these points there are numerous cases in the English Books; and we have acted on the same principles in this State.
 
 Irby
 
 v.
 
 Wilson,
 
 1 Dev. & Bat. Eq. 508.
 
 Brinegan
 
 v. Chaffin, 3 Dev. 108. As to the manner of enquiring into matter of this sort, it cannot be doubted that it must be by the jury, as of any other question of fact, or mixed question of fact and law. Owing to the peculiar division of jurisdiction between the ecclesiastical and common law Courts in England, it was held in early periods, that no special matter, avoiding a marriage, as bigamy for example, could be specially pleaded in a real action, but that the plea must be in the general form of
 
 ne unques accouple in loyal matrimonie,
 
 and that, upon issue joined thereon, a writ was sent to the Bishop of the Diocese, within which the other party alleged the marriage to have been celebrated, and his certificate in return was conclusive both of the fact and legality of the marriage. Dyer 368.
 
 Robins
 
 v.
 
 Crulchby,
 
 2 Wils. 122. But that necessarily
 
 *495
 
 could only extend to marriages within England ; for the Bishop had no better means of enquiring into the fact of marriage in another country than the civil Judge, and had no more authority to pronounce on its legality. Hence it is clear law in England, that, as to foreign marriages, the plea must conclude to the country and the trial be by the jury and not by certificate. Ild
 
 erton
 
 v. Ilderton, 2 H. Bl. 159.
 
 A fortiori
 
 it must be so here, as w'e have no Bishops, who have a legal ecclesiastical jurisdiction to determine on marriages and certify them. Of course, this conclusion is a complete answer to the notion of an estoppel; for what the law pronounces void cannot estop. It may be true, that, as respects third persons, people, who hold themselves out to be man and wife, may be responsible, as if they were what they profess to be : as a man may be liable for articles furnished to a woman he calls his wife and lives with. But it cannot affect the right of property, as between themselves.
 

 With respect to the opinions given against the defendant, which alone are properly before us, as the defendant' is the appellant, we concur with his Honor. If the doctrine of admitting an ancient deed, that is, one more than thirty years old, without proof of execution, is to apply to any conveyance of a chattel, it ought to do so to this; as the possession of the property and the custody of the deed have been, during the whole time, in the same hands, under a notorious claim of title, and it is actually proved, that the witnesses have both been long dead. If then the original had been produced., it would seem that under the rule, it ought to have been read._ If that be so, as its destruction, while in the custody of the law, has been clearly established, a copy is necessarily evidence ; for the copy is sufficient to establish the contents of the original, in such a case, and that is the whole purpose for which the original would be produced. But, without determining that point, we think it was evidence, and very strong evidencé, in aid of the length of time and other circumstances, on which the jury might and ought to presume a conveyance from Joseph Herring; the original ownar of the slave.—
 
 *496
 
 Here a man has been in exclusive possession of a female slave forty years, taking her immediately upon the death of the former owner, and raising a number of children from her, and tjje tjme cia¡mj[ng them under a deed from the former .owner, which he had in his possession and shewed, under .which a life interest was reserved to the maker of the deed, and the absolute property given to a person, under whom the .possessor claimed. The unqualified possession for so great a period, by itself, affords a high presumption of a title 5 but .when to it is added the fact, that the possessor really had an .instrument purporting to be a deed from the former owner, .that never was impeached by any relative or representative of the former owner, it amounts to plenary evidence, on which to found a presumption, that there was a conveyance by this instrument, as a genuine one, or by some other.
 

 In like manner, as between themselves, we think the actual possession of Henry Williams, which is stated in the case to have been exclusive and on a .claim of right by him against every person — including, therefore, Nancy Herring — continued from 1796 to 1818 in ,the lifetime of Nancy Herring, without any claim of title b.y her, and with acquiescence in his claim of title and possession: and such possession of Williams, continued farther .to 1836, without any question of its rightfulness by any person claiming under her, does afford a .very strong presumption in fact and law, that in some manner he had acquired her title, whatever it was, ft is true, that those two persons lived together, and that, though not man and wife, they were reputed and acted as such; and, therefore, it might be a question, in which of them the possession was, as
 
 -prima fp.de
 
 it would be deemed to be with the title. .But that point is not left to inference, as it is stated affirmatively, that Henry Williams had the possession, and that it was claimed exclusively by him, and that in that claim the .other party acquiesced, without setting up any in herself. Under such circumstances, the character of the possession is not dubious, but clearly in Henry Williams, upon an assertion of right in himself adverse to all others. As Nancy Herring
 
 *497
 
 was then
 
 sui juris,
 
 she is affected by such possession, as any other person would be; and there can be no doubt, that her action for the slave would have been barred by the statute of limitations. So, too, the possession for the great length time is ground for presuming a conveyance from her as from any other person. That we ought in this State to apply such a presumption to slaves, in a peculiar manner, is clearly to be deduced from the act of 1820, which makes a possession, that would protect the possessor from the action of the owner under the statute of limitations, that is, three years adverse possession, the owner being under no disability, amount in itself to a title. That act does not reach the present case, because Nancy Herring died two years before it passed. But the policy, which dictated it, requires the court to adopt and apply the doctrine of the presumption of a conveyance to the case of slaves in a peculiar manner. So much of the substance of our citizens consists of slaves, and the right to property in them is so vigilantly guarded, and the inconveniences arising from divesting the possessors of female slaves after long possession and the charge of bringing up their families are so manifest, that the Legislature felt bound to make the short adverse possession of three years constitute a good title ,• and in like manner calls upon the courts and juries to presume a good title upon long possession, unless reasonably rebutted by a fiduciary relation, or an acknowledged bailment, disability of the owner, or the like.
 

 Per Curiam, Judgment affirmed.